**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| DEBRA A. BLOUGH, ) | CASE NO.  5:10-cv-1821 |
| ) | |
| Plaintiff, ) | |
| ) | MAGISTRATE JUDGE |
| v. ) | VECCHIARELLI |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | **MEMORANDUM OPINION AND** |
| Defendant. ) | **ORDER** |

Plaintiff, Debra A. Blough ("Plaintiff"), challenges the final decision of Defendant, Michael J. Astrue, Commissioner of Social Security ("the Commissioner"), denying Plaintiff's applications for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("the Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I. PROCEDURAL HISTORY

On December 3, 2007, Plaintiff protectively filed applications for DIB and SSI. (Tr. 11.) In both applications, Plaintiff alleged a disability onset date of January 1, 2005. (Tr. 11.) Plaintiff's applications were denied initially and upon reconsideration, so Plaintiff requested a hearing before an administrative law judge ("ALJ"). (Tr. 11.)

On October 22, 2009, an ALJ held Plaintiff's hearing by video conference. (Tr. 11.) Plaintiff appeared at her hearing, was represented by counsel, and testified. (Tr. 11.) A vocational expert ("VE") also appeared and testified. (Tr. 11.) At the hearing, and in a Memorandum submitted by Plaintiff dated October 20, 2009, Plaintiff amended her alleged disability onset date to May 20, 2007, because an ALJ in a prior case granted an application for benefits on May 19, 2007, resulting in a closed period of disability. (Tr. 11.)

On November 18, 2009, the ALJ found Plaintiff not disabled as of May 20, 2007. (Tr. 21.) On June 21, 2010, the appeals council declined to review the ALJ's decision, so the ALJ's decision became the Commissioner's final decision. (Tr. 1.) On August 18, 2010, Plaintiff timely filed her complaint challenging the Commissioner's final decision. (Doc. No. 1.) On December 15, 2010, Plaintiff filed her Brief on the Merits. (Doc. No. 12.) On January 14, 2011, the Commissioner filed his Brief on the Merits. (Doc. No. 13.) Plaintiff did not file a Reply Brief.

Plaintiff asserts two assignments of error: (1) the ALJ improperly failed to give Plaintiff's treating physician's opinion controlling weight; and (2) the ALJ improperly found that Plaintiff's subjective statements were not credible.

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Plaintiff was 48 years old at the alleged onset date of disability and subsequently changed age categories to one "closely approaching advanced age." (Tr. 19.) She has a least a high school education and is able to communicate in English. (Tr. 19.) She has past relevant work as a stamping machine feeder and as a cashier. (Tr. 19.)

### B.  Medical Evidence

Plaintiff's assignments of error relate to her low back pain and neck pain; accordingly, the following review of the medical evidence will be limited to those impairments.

In 2003, Plaintiff suffered a C6-7 left facet joint fracture and T5 compression fracture in her neck as the result of a motor vehicle accident. (Tr. 445-47.) Plaintiff had been presenting to Dr. Douglas M. Ehrler, M.D., at Crystal Clinic for treatment of back pain (Tr. 445-50), and on October 8, 2003, Dr. Ehrler performed cervical fusion surgery on Plaintiff's neck (Tr. 445, 447). On November 21, 2003, Plaintiff was permitted to return to work with certain restrictions to avoid interfering with her recovery from surgery. (Tr. 444.) Plaintiff continued to receive intermittent care at Crystal Clinic for back and neck pain until May 16, 2005. (Tr. 440.)

On February 27, 2007, Plaintiff presented to Dunlap Memorial Hospital for evaluation of her pain and for medication management. (Tr. 289.) Dr. Daniel E. Lynch, M.D., attended to Plaintiff and reported the following history of problematic medication management. (Tr. 289.) On February 18, 2007, Plaintiff tried to have her narcotic pain medication prescription filled at K-Mart, but the K-Mart pharmacist refused to fill it

3

because the prescription was altered. (Tr. 289.) On February 20, 2007, Plaintiff attempted to have the same prescription filled at Wal-Mart and was refused for the same reason. (Tr. 289.) Plaintiff told the Wal-Mart pharmacist that a handicapped person who occasionally visited Plaintiff at Plaintiff's workplace "probably altered the script." (Tr. 289.) On February 22, 2007, Plaintiff tried to have a different prescription filled at CVS and was rejected because the date on the prescription was altered and illegible. (Tr. 289.) On February 23, 2007, a man presented to K-Mart to have the same prescription filled for Plaintiff, and the K-Mart pharmacist rejected the prescription for the same reason as did the CVS pharmacist. (Tr. 289.) On February 27, 2007, Plaintiff told a nurse at the Dunlap Memorial Hospital Pain Clinic that she filed a police report about the altered prescriptions; however, when Clinic staffpersons called the police department to confirm Plaintiff's report, they were informed by the police that there was no record of Plaintiff's police report. (Tr. 289.)

On November 5, 2007, Plaintiff underwent an x-ray of her back upon complaints of severe pain at the sacroiliac joints. (Tr. 296.) Dr. Robert Reaven, M.D., reported that the x-ray showed "[o]nly minimal degenerative changes of the sacroiliac joints" and "some degenerative changes in the lower lumbar spine." (Tr. 296.) The next month, on December 10, 2007, Dr. William H. Fiegenschuh, Jr., M.D., reported that an MRI of Plaintiff's lumbar spine revealed "[d]egenerative disc disease with mild concentric disk bulge and mild neural foraminal narrowing bilaterally" at L4-5, and "[m]ild degenerative disk disease without significant neural foraminal narrowing or central canal narrowing" at L5-S1. (Tr. 294.)

Plaintiff continued to present to Dr. Fiegenschuh regularly for pain management

4

until March 2009. (Tr. 334-42.) On January 24, 2008, Dr. Fiegenschuh indicated that Plaintiff reported having increased pain at work; however, Plaintiff reported that she had been lifting approximately 50 pounds, which Dr. Fiegenschuh indicated was more than what Plaintiff had been cleared to lift. (Tr. 342.) Dr. Fiegenschuh decided to keep Plaintiff on Methadone for her pain. (Tr. 342.)

On February 21, 2008, Plaintiff reported that she was "preparing to quit her job and get a new job without so much back-straining work and stress." (Tr. 341.) On March 20, 2008, Dr. Fiegenschuh reported that Plaintiff was "doing well with her pain management at the present level of Methadone." (Tr. 340.)

On April 17, 2008, Plaintiff reported to Dr. Fiegenschuh that her back pain prevented her from doing her spring yard work. (Tr. 339.) Dr. Fiegenschuh indicated that Plaintiff "needs to have . . . surgery for her back; however, it seems that this may not be a priority for her." (Tr. 339.) However, on May 15, 2008, Dr. Fiegenschuh indicated that Plaintiff "is stable as far as pain is concerned." (Tr. 338.) Moreover, Dr. Fiegenschuh indicated that Plaintiff "is somewhat inappropriate in stating that she can feel the Methadone wear off after 8-9 hours," and that Plaintiff "still has not filled any prescriptions for NSAID's because of 'cost'." (Tr. 338.) Dr. Fiegenschuh did not believe Plaintiff's explanation that she could not afford her NSAID medication and planned on obtaining a toxicology screen of Plaintiff at her next appointment. (Tr. 338.)

On June 6, 2008, state consultative examiner Paul Scheatzle, D.O., examined Plaintiff at the request of the Bureau of Disability Determination. (Tr. 303-09). Dr. Scheatzle's physical residual functional capacity ("RFC") assessment of Plaintiff is as follows. Plaintiff's ability to sit was unlimited so long as she could change positions

5

every thirty minutes.  (Tr. 308.)  She could stand frequently so long as she could change positions every thirty minutes.  (Tr. 308.)  She could walk one city block before she needed to rest.  (Tr. 308.)  She could lift 20 pounds occasionally and 10 pounds frequently, and carry 20 pounds.  (Tr. 308-09.)  She could not repetitively bend or twist, and she could not climb, crawl, or perform overhead work activities.  (Tr. 309.)  Her abilities to handle objects, hear, speak, travel, understand, remember, concentrate, persist, socially interact, and adapt were within normal limits.  (Tr. 309.)

On June 12, 2008, Plaintiff presented to Dr. Fiegenschuh for continued follow-up regarding her pain.  (Tr. 337.)  Dr. Fiegenschuh reported that Plaintiff "had been stable in the warmer weather and offers no complaints of increased pain or discomfort."  (Tr. 337.)  Plaintiff reported her pain at 3 out of 10 in severity.  (Tr. 337.)

On July 12, 2008, Plaintiff reported that she had been working outside a lot and had increased discomfort as a result.  (Tr. 336.)  Dr. Fiegenschuh told Plaintiff that her discomfort was normal for someone with degenerative joint disease and that she should use either ibuprofen or naprosyn for that type of pain.  (Tr. 336.)  Dr. Fiegenschuh concluded that, otherwise, Plaintiff was "doing fairly well."  (Tr. 336.)

On July 28, 2008, state agency reviewing physician Dr. William Bolz, M.D., completed a physical RFC assessment of Plaintiff, which is as follows.  (Tr. 325-32.)  Plaintiff could occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds.  (Tr. 326.)  She could sit, stand, and walk for about 6 hours in an 8-hour day with normal breaks; and her ability to push and pull were not limited except to the extent that she was limited in lifting and carrying.  (Tr. 326.)  She could frequently balance and stoop.  (Tr. 327.)  She could occasionally climb ramps and stairs, kneel, crouch, and

crawl.  (Tr. 327.)  She could never climb ladders, ropes, and scaffolds.  (Tr. 327.)  She had a limited ability to handle, but an unlimited ability to reach in all directions, finger, and feel.  (Tr. 328.)  She had no visual or communicative limitations (Tr. 328-29), and she had no environmental limitations except that she should avoid all exposure to hazards such as machinery and heights (Tr. 329).

In conclusion, Dr. Bolz opined that Plaintiff's "credibility is minimal" because: Plaintiff was dismissed from one of her treating sources for altering prescriptions; one doctor was of the impression that Plaintiff did not appear in as much distress as she claimed; and her reported symptoms were not supported by physical findings and the fact that she worked part-time—six hours a day for three days a week—as a home health aide.  (Tr. 330.)

Between August and the end of December 2008, Dr. Fiegenschuh reported that Plaintiff's pain remained stable with her medication (Tr. 334-35, 357-59), although on August 14, 2008, Dr. Fiegenschuh indicated that Plaintiff "needs . . . back surgery desperately" but was unable to obtain insurance coverage (Tr. 335).

On December 30, 2008, Dr. Fiegenschuh reported that Plaintiff "states that she re-injured her lower back last week in attempting to get a 300 lb+ patient back in bed." (Tr. 356.)  Dr. Fiegenschuh continued to report that Plaintiff explained "[s]he had attempted to push the patient across the mattress and suffered the strain to her lower back."  (Tr. 356.)  Dr. Fiegenschuh noted that Plaintiff "does have a lifting restraint of 25 lbs., this activity exceeding the restriction."  (Tr. 356.)  Dr. Fiegenschuh also noted that Plaintiff "is in need of a spinal fusion by her past history and orthopedic surgeons [sic] opinion."  (Tr. 356.)

7

On January 2, 2009, Dr. Fiegenschuh authored a letter indicating that Plaintiff: had been under his care for back pain since March 6, 2007; reported she worked only 15 to 20 hours a week; had a weight restriction of lifting no more than 25 pounds; was presently unable to be fully employed; and was in need of corrective lumbar surgery. (Tr. 351.)

On January 27, 2009, Dr. Fiegenschuh reported that Plaintiff "has no change in her pain level." (Tr. 355.) On February 26, 2009, Dr. Fiegenschuh indicated that Plaintiff reported her pain had slightly worsened; however, Dr. Fiegenschuh noticed no significant change in Plaintiff's demeanor so he decided not to increase Plaintiff's medication dosage at that time. (Tr. 354.) Dr. Fiegenschuh also noted that Plaintiff "needs to get moving to get her MRI done and move on with corrective surgery." (Tr. 354.) On March 26, 2009, Dr. Fiegenschuh reported that Plaintiff "has no change in her pain status." (Tr. 353.)

On May 20, 2009, Plaintiff presented to the emergency room complaining of hip and leg pain. (Tr. 390.) Plaintiff was diagnosed with a lumbosacral strain and left hip pain with radicular pain. (Tr. 391.) On May 25, 2009, Plaintiff returned to the emergency room complaining of ongoing left leg pain and requesting a work excuse because of the pain. (Tr. 389.) Plaintiff was diagnosed with mechanical back pain and was discharged. (Tr. 389.)

On August 17, 2009, Plaintiff presented to Dr. Ayman H. Basali, M.D., at the Pain Management Institute for an evaluation and management of her neck pain that allegedly radiated to the left upper extremity. (Tr. 383-85.) Dr. Basali reported the following. Plaintiff arrived with an empty bottle of prescription Methadone and reported

8

that she just finished the prescription that day—even though the prescription had been issued two months before and should have expired one month before. (Tr. 383.) Dr. Basali did not have Plaintiff's medical records, and Plaintiff changed her story several times regarding her medication intake and compliance. (Tr. 383.) Plaintiff reported that her treating physician, Dr. Fiegenschuh, assaulted her during an examination so she did not want to see Dr. Fiegenschuh again. (Tr. 383.) Plaintiff persistently asked about obtaining a Methadone prescription, and Dr. Basali refused to prescribe Plaintiff Methadone at that time because of the lack of medical records and her changing story about her history of medication. (Tr. 385.) Plaintiff was not satisfied with her visit with Dr. Basali, so she reported to the front desk upon leaving Dr. Basali's office that she would file a complaint about Dr. Basali with the American Medical Association. (Tr. 385.) Because of Plaintiff's behavior and lack of medical records, Dr. Basali was uncomfortable taking over responsibility for Plaintiff's pain medication and did not schedule a follow-up appointment with Plaintiff. (Tr. 385.)

On August 19, 2009, Plaintiff presented to her primary care physician, Dr. Andrew J. Naumoff, M.D., with a complaint of back pain and a request for a prescription for Methadone. (Tr. 382.) Dr. Naumoff reported that Plaintiff gave a "confusing story" regarding "trouble" with her pain management doctors, but he agreed to give her no more than 10 days worth of Methadone. (Tr. 382.)

On September 15, 2009, Plaintiff presented to Dr. Amgad L. Takla, M.D., upon referral from Dr. Naumoff, for evaluation and treatment of Plaintiff's back pain. (Tr. 451-53.) Dr. Takla diagnosed Plaintiff with cervical spondylosis post fusion surgery, lumbar spondylosis with degenerative disc disease, and facet osteoarthritis affecting the lower

lumbar spine. (Tr. 452.) Dr. Takla noted that he had none of Plaintiff's treatment records and could not take over her care until he received them. (Tr. 452.)

### C. Hearing Testimony

#### 1. Plaintiff's Testimony

Plaintiff testified at her hearing as follows. At the time of the hearing, Plaintiff worked part-time as a home health aide. (Tr. 33.) She worked about 12 to 15 hours a week. (Tr. 33.) She drove to clients' homes, which were approximately a 15 minute drive from her home, and performed general housework such as making beds, vacuuming or scrubbing floors, and ensuring that the clients take took their medications. (Tr. 34.) Plaintiff was not able to perform other housework, and Plaintiff's clients allowed her to rest often while working. (Tr. 34.) Plaintiff was not required to lift or transfer clients (Tr. 34), although in December 2008 Plaintiff "pulled her back" while working with another home health aide and the other home health aide convinced Plaintiff to assist moving a 300-pound client into bed. (Tr. 34.)

Plaintiff lives alone and her friends help Plaintiff with chores around the house and with grocery shopping. (Tr. 43-44.) Plaintiff suffers pain in her lower back and "tailbone" area, hips, and legs that prevents her from standing for more than 45 minutes. (Tr. 35, 38.) The pain in her back is "very sharp, like stabbing pain." (Tr. 37.) She cannot sit without having to stand frequently; she cannot walk more than a half block; and she can lift only up to 15 pounds. (Tr. 38-39.) Plaintiff also has pain in her neck and shoulders (Tr. 36), and numbness in her left hand causes her to lose her grip and diminishes her finger dexterity (Tr. 42).

Plaintiff was discharged from Dr. Lynch's practice after Plaintiff explained to him

how she was unable to get her prescription for Tramadol filled because the mentally disabled child of a wealthy client had visited Plaintiff's house and scribbled on Plaintiff's prescription while sitting at the kitchen table.  (Tr. 45.)

### 2. The VE's Testimony

The ALJ posed the following hypothetical question to the VE:

> Assume we have an individual with the same age, educational background and past work experience as the claimant. Further assume the individual retains the residual functional capacity for work with the following additional limitations. She would be limited to light work.  She would require a sit/stand option such that she would need to alternate sitting and standing no more than 30 minutes at a time. She would have no more than occasional stooping, bending, kneeling.  There'd be no crawling, no hazards, no ladders, no dangerous machinery, and there would be no overhead work. And she would be limited to simple tasks.

(Tr. 51-52.)  The VE testified that such a person could not perform Plaintiff's past relevant work, but could perform other work as a laundry worker (for which there were 1,500 jobs in Ohio and 40,00 jobs nationally), inspector (for which there were 1,700 jobs in Ohio and 200,000 jobs nationally), and parking attendant (for which there were 3,000 jobs in Ohio and 163,000 jobs nationally).  (Tr. 52.)  The VE based his testimony on the Dictionary of Occupational Titles ("DOT") and his personal experience.  (Tr. 52-53.)

The ALJ then asked the VE a second hypothetical:

> [A]ssume the individual could lift up to 20 pounds occasionally, frequently lift 10 pounds, and she could sit six hours in an eight-hour day, stand and walk two hours each in an eight-hour day, and the other limitations would remain the same.

(Tr. 53.)  The VE testified that such a person could perform the jobs to which he testified.  (Tr. 53.)  The ALJ then asked a third hypothetical:  [A]ssume the individual required frequent and unscheduled rest breaks given those limitations."  (Tr. 53.)  The

11

VE testified that such a person could not perform any work on a full-time basis.  (Tr. 53.)

Plaintiff's counsel offered a hypothetical person with the same characteristics as those in the ALJ's second hypothetical, but with the addition that the hypothetical person was restricted to "only occasional grasping or gross manipulation on the left side, so only occasional ability to bilateral handling and grasping."  (Tr. 54.)  The VE testified that such a person would only be able to perform the parking attendant job to which he previously testified.  (Tr. 54.)  The VE also testified that such a person could perform other work as an information clerk in a mall or public building (for which there were 2,800 jobs in Ohio and 110,000 jobs nationally), surveillance system monitor (for which the VE did not give any numbers of jobs), and nonapprehending merchant patroller (i.e., security guard) (for which there were 350 jobs in Ohio and 36,000 jobs nationally).  (Tr. 55.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

### IV.     SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2. The claimant has not engaged in substantial gainful activity since May 20, 2007, the alleged onset date.

3. The claimant has the following severe impairments: low back pain (degenerative disc disease), neck pain, and affective disorder.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, specifically when considering the criteria set forth in sections 1.00 and 12.04 *et seq.*

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work . . . except that she would need to sit or stand no more than 30 minutes at a time. The claimant could never perform crawling or engage in overhead work/reaching. She would need to avoid any exposure to ladders and hazards/dangerous machinery and would be limited to no more than occasional stooping, bending, and kneeling. The claimant would be limited to simple tasks.

6. The claimant is unable to perform any past relevant work.

. . . . .

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 20, 2007, through the date of this decision.

(Tr. 13-21.)

## V.   LAW & ANALYSIS

### A.   Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512

(6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy,* 594 F.3d at 512.

### B.     The ALJ's Assessment of Plaintiff's Treating Physician's Opinion

Plaintiff's treating physician, Dr. Fiegenschuh, opined in a January 2, 2009, letter that Plaintiff was restricted to lifting no more than 25 pounds; that Plaintiff could not perform full-time work; and that Plaintiff needed corrective lumbar surgery. The ALJ explained that he did not give significant weight to Dr. Fiegenschuh's opinion because: (1) Plaintiff presently worked part-time; (2) Plaintiff's objective tests were mild; and (3) in November and December 2008, Dr. Fiegenschuh reported that Plaintiff's pain was stable with medications, and that Plaintiff "rarely has breakthrough pain of significance."

15

(Tr. 18.)  Plaintiff contends, however, that "the greater weight of the evidence shows [Plaintiff's] pain did not resolve, that it continued to limit her functional abilities, that her doctor continued to recommend surgery, and that rejecting Dr. Fiegenschuh's opinion was in error."  (Pl.'s Br. 12.)  The Court is not persuaded that the ALJ erred in rejecting Dr. Fiegenschuh's opinion.

Although the opinions of treating physicians should be given greater weight than those of physicians hired by the Commissioner, s*ee Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1054 (6th Cir. 1983), such opinions are accorded deferential weight only when they are supported by sufficient clinical findings and are consistent with the evidence, *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 287 (6th Cir. 1994).  Moreover, statements from any medical source that the claimant is "disabled" or "unable to work" are not medical opinions, but are rather comments on a determination reserved for the Commissioner and, therefore, are not entitled to controlling weight or special significance.  20 C.F.R. § 404.1527(e); S.S.R 96-5p, 1996 WL 374183, at *1 (1996); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985).  If an ALJ decides to give a treating physician's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  See *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (1996)).

Here, the ALJ gave good reasons for rejecting Dr. Fiegenschuh's opinion.  The ALJ found Dr. Fiegenschuh's conclusion that Plaintiff could not perform full-time work inconsistent with other evidence because Plaintiff's objective tests were mild and Dr.

16

Fiegenschuh contemporaneously opined that Plaintiff's pain was stable.  It was not improper for the ALJ to reject Dr. Fiegenschuh's opinion that Plaintiff was not able to perform full-time work because that opinion was not a medical opinion but rather a determination reserved for the Commissioner.  Moreover, the ALJ incorporated Dr. Fiegenschuh's lifting restriction into his determination of Plaintiff's RFC, as the ALJ determined that Plaintiff could perform light work and light work precludes lifting more than 20 pounds at a time.  20 C.F.R. § 404.1567(b).

Plaintiff's contention that the greater weight of the evidence shows that Plaintiff's pain did not resolve, that Plaintiff's pain continued to limit her functional abilities, and that Dr. Fiegenschuh continued to recommend surgery is based on an incorrect legal standard, as a decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  Ealy, 594 F.3d at 512.  Plaintiff has not explained how the ALJ's assessment of Dr. Fiegenschuh's opinion was deficient.  Accordingly, this assignment of error lacks merit.

### C.   The ALJ's Assessment of Plaintiff's Credibility

Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).  The ALJ's decision must contain specific reasons for his finding on credibility, supported by the evidence in the case record, and must be

17

sufficiently specific to make clear to the claimant and to any subsequent reviewers the weight he gave to the individual's statements and the reasons for that weight. S.S.R. 96-7p, 1996 WL 374186, at *1 (1996).

Here, the ALJ explained that Plaintiff's subjective statements regarding the extent her symptoms limited her were not credible for the following reasons:

> The claimant originally denied lifting patients.  However, when seen by Dr. Fiegenschuh on December 30, 2008, the claimant reported that she reinjured her low back during the previous week attempting to get a 300-pound patient back in bed. The claimant has a history of altering a prescription.  She was dismissed by one doctor . . . [and] [h]er statements concerning her impairments and their impact on her ability to work are not entirely credible in light of the discrepancies between the claimant's assertions and information contained in the documentary reports and the medical history.

(Tr. 18-19.)  Plaintiff contends that it was improper for the ALJ to find that Plaintiff lifted a 300-pound patient, in contrast to Plaintiff's testimony that she did not lift patients, because Plaintiff's explanation at the hearing clearly established that Plaintiff merely *assisted* a co-worker and did not lift the patient herself.  The ALJ did not, however, find that Plaintiff *lifted* anyone; rather, he found evidence that Plaintiff *attempted to place a 300-pound person into bed*.  Plaintiff testified that her job as a home health aide did not require the exertional demands of moving people, and this testimony was contradicted by evidence that she participated in moving a 300-pound person into bed.  It was not unreasonable for the ALJ to conclude that Plaintiff's subjective statements were less than credible in light of this inconsistency in the evidence.

Plaintiff also contends that it was improper for the ALJ to rely on Plaintiff's alleged alteration of a prescription as a basis to discredit Plaintiff because Plaintiff's explanation that a mentally handicapped guest scribbled on the prescription was

18

consistent throughout the record.  The Court disagrees that Plaintiff's account of the allegedly altered prescription was consistent.  Plaintiff told the Wal-Mart pharmacist that a handicapped person who occasionally visited Plaintiff at Plaintiff's workplace *probably* altered the prescription, in contrast to Plaintiff's more elaborate explanation at her hearing.  Although Plaintiff told a nurse at the Dunlap Memorial Hospital Pain Clinic that she filed a police report about the altered prescriptions, hospital staffpersons were informed by the police that there was no record of Plaintiff's police report.  And Plaintiff was discharged from care by Dr. Lynch after Plaintiff explained to him how her prescription was altered.  Indeed, the record contains several instances where doctors reported that Plaintiff's subjective history of her prescription medication changed or was "confusing."  Again, it was not unreasonable for the ALJ to conclude that Plaintiff's subjective statements were less than credible in light of these inconsistencies in the evidence.

The ALJ's decision contains specific reasons for his finding on credibility that were supported by the evidence in the case record and that were sufficiently specific to make clear the weight he gave to Plaintiff's statements and the reasons for that weight.  Accordingly, this assignment of error lacks merit.

## VI.  CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

*s/ Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: September 16, 2011